Okay, we're going to call the next case, but before we call the next case, this is a matter of personal privilege. I'm the circuit judge. Who is from Puerto Rico, I just want to know officially. Today is the 72nd anniversary of the Constitution of Puerto Rico. I have a copy here, so I just wanted to share that with everybody since I'm not back home. And it's a holiday over there, so I'm working. So, okay, let's call the next case. Thank you, Judge. I'll put us on the record now. The next case, number 23-2051, Responsible Offshore Development Alliance versus the United States Department of the Interior et al. At this time, would counsel for the appellant, Responsible Offshore Development Alliance, please introduce himself on the record to begin. Good morning, Your Honors. Roger Marzullo, appearing on behalf of the Responsible Offshore Development Alliance. Could I ask the Court if I may reserve two minutes for rebuttal? Okay, you may. And before we begin with the clock, these are probably the same comments and questions I made in the earlier case, which is similar. They haven't been consolidated, but involve the same defendants. We received all the Rule 26J letters. We're familiar with that. I also do want to note, as I mentioned in the other case and throughout the arguments, I think it's important to address if you think it's necessary. Some months ago, we decided an Nantucket residence against turbines versus Bowen case. If you think that's applicable or not applicable, I know it was distinguished in the other case, but I'm just bringing that up because it was another challenge to these windmill projects. And last but not least, if you think the latest Supreme Court case impacts how we should resolve this matter, as it was discussed in the earlier case, please address that one way or another. With that said, you may begin. Very good. Thank you, Your Honor. And let me start on a note of bringing together. We agree with the government that the Nantucket decision really doesn't have much controlling force here because it dealt with challenges primarily on a scientific ground to the 2021 biological opinion, and that is not an issue in this case. I'd like to start, if I might, responding to a couple of questions that the court dealt with earlier. When you say earlier, you mean in the case that was just argued before this, that would be Seabreeze Shoreside? In the Seabreeze case, yes, Your Honor. With respect to the Outer Continental Shelf Lands Act, what the trial court did, I think the court has correctly stated what the standard under that statute is. That is not what the trial court did. The trial court, as Mr. Steland pointed out, referenced back to Massachusetts v. Andrews. That was a case in which the court decided that with respect to oil and gas, which is not governed by the same statute, that the court should balance the interests of oil and gas against the interests of the fisheries, and that they were more or less equal and they ought to be balanced one against the other. That's the reason there's no balancing test here. I'm not arguing with what the court said about safety, about environment, or whatever. What I am saying is the district court did not apply that standard. She instead did a balancing test, which is not allowed under the statute. Number two, there was this discussion about the language in the record of decision that the fishermen would abandon the entire 75,000-acre area, and the trial court said, oh, well, that's not in the case anymore because they removed it. They didn't remove it. What the amendment says is this information came from the fishing industry. The government agencies did not say that they do not agree with it, that they don't believe it. Why would they put it in the record of decision in the first place? I haven't read all 290,000 pages, but it does strike me that the overall thrust of what the record of decision is, there will be some harm to fishery, there will be a mitigation fund, we've taken steps, but that seems inconsistent with the idea that this project is going to have this devastating effect on fisheries. That may well be, Your Honor, but it's in the record as a finding of fact by the agency, and that's the point that I am pointing out. And, in fact, if you look at where they got it from, they got it from their own environmental impact statement. And the existence of that fact, given what I just said is the reason to unwind this whole project, that that follows? No, I'm simply trying to clarify that the trial court was flat wrong when she said that that statement is no longer in the record. Now, this court may have to deal with the fact that if the court looks at it that way, that there is a conflict in the findings of fact by the agency. On the one hand, they say the fishermen will abandon. On the other hand, they say it's going to be just a moderate impact. That's what they say in the environmental impact statement. And that's the problem, that you've got conflict here, and that's why this case illustrates the problem with an agency trying to take a very important, very massive project, such as the production of offshore wind, and to do so in a hurry-up method that shortcuts the environmental health and safety statutes. The third point the court asked about evidence of environmental interests, at least speaking on behalf of the alliance, which is my client, we have a memorandum of understanding in the appendix at 117, in which the alliance has for many years been working with the National Marine Fishery Service on issues, including the health of the marine environment. The trial court missed that. We have instances... Do you think that that's sufficient to bring you within the Mammal Protection Act for the whales? Marine Mammal Protection Act is easier, Your Honor, because the city of Sausalito applies a test very similar to Bennett v. Speer, and I think it's the right one. That case has been followed by a number of other cities. That's the case, you'll recall, that involves the seals in San Francisco. So Bennett says, right, the ESA has a citizen supervision, so essentially zone of interest melds into Article III, but there is no such provision in the Mammal Protection Act. Yeah. Actually, the language I'm referring to in Bennett, and we quote it in our brief, is that one purpose of the Endangered Species Act was to avoid needless economic dislocations, and there was referencing the far and extreme, sometimes very strict, reach of the Endangered Species Act to individuals. Remember, in that case, it was farmers who weren't getting their irrigation water because it was being taken to... Can you just articulate, I would just like you to hear you articulate, what is the interest of either of the alliance in the whales? In addition to the fact that the whales, too, depend upon the health of the ocean, and maybe this goes to even the broader issue of NEPA standing, there are few occupations, few activities, that as much as commercial fishing, place the individual, the human, in the middle of the environment, the ocean, both the water, the marine environment, the species that live there. That is their natural... The natural habitat of the fishermen is out there in the ocean, and to say the ocean isn't an environment, fish aren't an environment, the fish that will be and have been. But I think you need to articulate the alliance's interest in the whales. Oh, well, and in whales, there is, of course, they watch the whales just like others. We're talking now about marine mammals. Yes, correct. Yes. I think one of the issues they have worked on with the National Marine Fisheries Service under the MOU has been the protection of the right whale, which, of course, is a key issue for this particular project and for other offshore projects. And let me add, we had a case last year, I believe it was about the protection of the right whale. Yes, you did, Your Honor. And the impacts of these, not just this project, but the projects up and down the coast on the right whale have been and are threatening to be extraordinary. That's not an issue per se in this case. But I would point out that the alliance has been working with NIMS on right whale issues, and that, too, gives them standing. In that case, well, I recall on both panels, we heard it twice, it was commercial, I believe, lobster fishermen trying to, there were some regulations in favor of the whales, protected the whales. That's correct, Your Honor, and one of the interesting points about that is the more the whales are injured by offshore wind, the greater is going to be the regulation to protect them that is going to be imposed upon the fishermen. That is a major concern of theirs. So if I could move on to the standing issues, I think the district court should be reversed for her findings, her holdings, first of all, that the alliance had no standing under the Endangered Species Act, and I think the court has already mentioned Bennett v. Speer. There's also the Glickman case involving the timber company that had standing to sue the Forest Service under the Endangered Species Act. There's the Carpenters Union case, once again suing the Forest Service. So if I don't think that what you just told me about interest in the whales is sufficient, let's just assume that for the purpose of this question, the Endangered Species Act, unlike the Mammal Protection Act, is it right to say it doesn't require that? Your argument is this project, this wind project that hurts us, would never have happened, government, if you had followed the proper procedures. That's enough to give us standing under the Endangered Species Act. Do you agree or disagree with that? Yes, Your Honor, I think you've articulated our argument, and I think the same is true if they didn't have a permit to discharge pollutants into the inevitable waters, which they also have, which we've also challenged. If they didn't have an environmental impact statement, which they didn't have to prepare, that is, if the government skipped over all those steps, then that is an injury in fact. All right, so let's assume that you're right about that, and you have Endangered Species Act standing. Your central argument seems to me that this project should be unwound because the 2020 buy-off was under re-initiation review at the time the record of decision was entered, even though that eventually we entered a 2021 buy-off that made no significant changes, but nevertheless it was a procedural backfire, and therefore the project should be unwound. That seems somewhat drastic to me. The alternative, and what the government's asking you to say, is that projects may be approved and may move forward without a biological opinion. Do you agree that the government took steps to make sure there was no adverse impacts on the reasons related to the re-initiation as they waited for the re-initiation to happen? I don't know that that's true, Your Honor. I don't know what steps they took. Well, they say that they took the step of, you can't use these monitors while we're doing the re-initiation. If I may expand slightly on what our argument actually is, it is this. The Interior Department came to NIMS, the protection agency, and said, we have new information, and we have made changes in the project such that none of these were considered in the prior biological opinion. Now, if they had stopped there, I think the court would have no problem saying, well, you didn't have a valid biological opinion. So the only argument the government has is, well, we re-initiated a consultation. Well, the law is very clear that you can't approve a project during a consultation because the ultimate purpose, the whole purpose of this process, is to arrive at a determination whether or not this project causes jeopardy to the continued existence of the species. The 11th Circuit case says, listen, there was an opinion that said no jeopardy. Then a re-initiation was authorized, and we don't know what the outcome of that could be. It could be no jeopardy again. And so there's not some hard and fast rule that says, while re-initiation is going on, that that first finding of no jeopardy disappears. In fact, they can go forward, but it seems to me what was done here, which lessens some of the concerns I have, is some steps were taken to alleviate what might happen as they go forward with the re-initiation about those things that might change the opinion. So why is that 11th Circuit case wrong, I guess? Well, as I, again, I'd go back to my point, that if you stop at the point that the agency has said, there's new information, and we've changed the project, and none of that was considered in the biological opinion. At that point, you don't know, is it going to jeopardize the species or not? We're not talking just about whales here. We've got turtles. We've got dolphins, sturgeon. There are a number of endangered species here. So at that point, does the agency say, but I'm going to go ahead, and I'm going to approve this project without knowing whether it jeopardizes any of those species or not? But I know it doesn't jeopardize them for all the reasons, except for the new ones. And the new ones, I'm going to take steps to make sure that we don't harm the species while we investigate the new ones. What's wrong with that? Well, I think what's wrong with that is that's not the statute that Congress passed. That's not the regulations that govern Section 7 consultation. And it's not in the record as to, but they took all these steps to make sure that the species was protected. And let's just talk about the right whale. What steps did they take to ensure that there was not danger to the right whale during this five months? It's five months after... Well, if the re-initiation is, the monitors might cause harm, and the answer is, while we re-initiate, we're not going to use the monitors, that seems to be a response. Yeah, if you ignore the law and you ignore the regulations, then you can do that. And I think that goes back to my main point, that the agency attempted to shortcut and evade the statute and the regulations in order to approve this project. Counsel, let me ask if Judge Monte Carlo or Judge Afram have any other questions. And then you have 30 seconds. Any other questions? We're going to do some last closing thoughts. You have two minutes for rebuttal. Yes, thank you, Your Honor. Okay, thank you. Let's then hear again from Ms. Hanson-Young for the Department of the Interior. Please identify yourself for the record, and before your time starts running, I'll just make the same question I posed earlier in the other case. Good morning. May it please the Court. My name is Tecla Hanson-Young, and I represent the United States. Okay, and my question, which I've asked in the case that was heard earlier today, Seafree Shoreside, as well as in the previous case a month ago, the Nantucket resident case, and you've answered the same each time, and I'm sure you will again, but just for the record, the agency, if we affirm the decision below, the agency will still continue to provide oversight of everything that's going on periodically, and if changes need to be made or information received, it's an open, ongoing, prospective process, correct? Yes, that's right. Okay, so with that said, your 10 minutes are going to start running now. Thank you. I'd like to start with the MMPA claims in this case because I do think that these claims are resolved by this Court's previous decision in the Malone case, and the Court need not even get into the question of whether the Alliance can state a claim under the MMPA here because the merits issues that they raised in the District Court are identical to the issues that were resolved in Malone, which this Court resolved in favor of the United States. And here they didn't brief the merits of the MMPA, they just said Judge Talwani was wrong on the standing, correct? That's correct. And so it would remand, presumably if this Court found there was standing, it would remand to District Court, but the merits have already been resolved, so there's no need. Additionally, the claims are moot because the MMPA claims involved in incidental harassment authorization, that has expired. Now, the agencies are in the process of deciding whether to issue a new one, but that will be a new agency action subject to judicial review on a different administrative record. As to the ESA claims... Is it just so, because I hadn't thought of this argument until you just said it. Sure. Is there a problem in that they might make different arguments attacking the incidental harassment permit than was made by the other parties in the Nantucket case? In this litigation, no, because what they did at summary judgment was they incorporated by reference all of Malone's arguments. So it's really, there was no independent briefing on the merits issues. Now, to be fair, there is a wrinkle where Malone didn't appeal all of his adverse rulings, so I think he raised six, something like five or six challenges under the MMPA, and he only appealed three of them, so the Court of Appeals hasn't resolved the other three issues that the district court resolved, but it would still be moot. And tell me what your reaction is to the zone of interest problem. Under the MMPA? Yeah. So the problem there is it's a lot easier than the NEPA claims, because the alliance ties its standing under the, or its ability to bring a claim under the MMPA to the Declaration of Arapache, which is the owner of one of the companies that is the sea freeze plaintiff, and he asserts a recreational and aesthetic interest in watching right whales, but he's not a named plaintiff. It could have been easily solved if he was a named plaintiff, but he's not, and the alliance, as a trade association representing fishing industry, does not have any interest in protecting right whales. And so you disagree with what I heard a minute ago, which is the Memorandum of Understanding, which talks about we care about the oceans. That's not broad enough to capture an interest in the whales. No, because the Memorandum of Understanding refers to protecting the environment so that the business members can fish more. So it's not about protecting the habitat for right whales. Just because I think this is important to the answer. So to say that I care about the ocean as the alliance is not enough. It's I care about the ocean, why? Well, I care about the ocean so I can fish. My caring about the ocean, the health of the whales has nothing to do with that fishing connection, and that's the problem. Well, they don't even say that they care. They don't, I think, with respect to whales, they don't even mention whales at all in marine mammals. Right. They say they care about the ocean. Right. And they would say, I think they said, the whales are part of the ocean. But they don't fish for whales. That's what I'm saying. They don't earn any money from fishing. So what's lacking is the alliance's yes, they care about the oceans, but they care about the oceans for a purpose. Right. That purpose is fishing, not aesthetic interests of whales. Right. And I think there's another consideration that this court should take into account, at least with respect to the right whales, which is that none of the construction, so this is, I'm bringing this to the ESA claim, if there's, so if we want to go back to MMPA, that's fine, but there was, when the biological opinion, when the record of decision was issued, the 2020 biological opinion still remained in effect. The agencies didn't say, this isn't invalid, we think that it's really problematic, and we're going to issue this project anyway. But they say there's case law that says by operation of the fact of the re-initiation. Just the one, yes, which is not, which actually, our position is it doesn't actually say that. It's in the background section. But the terms of the re-initiation itself actually say that the terms of the original 2020 biological opinion will remain in effect pending re-initiation of consultation. So the agencies were in effect saying the 2020 biological opinion is still in effect here. And the other thing that I wanted to note is that there were no activities going on at the time that would impact right whales. Those activities are limited to pile driving, the noise, and that didn't happen for several years after the permits were issued. The construction. But even activities like that, I know from the record in the previous two cases or it's been discussed, or it's in the record that even there's a pile driving or other things, it's at certain times, certain periods of the year, so the agency has seemingly taken precautions to minimize any damage. Numerous precautions, yes. Extensive precautions. So is that a merits answer or is that an Article III answer? That's a merits answer. But my point is that to the extent that there's questions about what was the agency doing to ensure that species, listed species, would not be in jeopardy pending reinitiation of consultation, there were no activities that would have impacted right whales. So that's a point to strengthen your argument that there was not some ultra-various action by approving the record of decisions.  And I also want to note that agencies are under an ongoing obligation under the ESA to reinitiate consultation at any time, so to sort of, and every year there's new population information about right whales that comes out. So it's sort of, you know, in some ways, the agency would never be able to issue a permit if it always had to wait for the newest information to come out before it could issue that permit. So the agency, you know, this is really an example of good governance here. I mean, the agency didn't expect any impacts to change, which did an extensive analysis in the biological assessment and prevented any activities from occurring that it hadn't previously analyzed. And was I right to say that the monitoring that was the basic subject of the reinitiation was explicitly said will not happen while we reinitiate? That's correct. And just atmospherically, the monitoring surveys were to help the agencies assess additional fishing impacts. So, I mean, they're not, they were added to the project after the fact.     They weren't, you know, they didn't involve construction of the project or major components of the project that the agency should have considered before but didn't, for example. So the... How about the standing? We just talked about the merits of the ESA, but the judge found standing was a problem, which I have questions about because it seems to me that what they're saying is you committed, and whether right or wrong, they're saying you committed a major procedural error that led to the project. If you hadn't committed that error, there would have been no project. Had there been no project, we'd be better off. Why is that not standing? Well, I think the government doesn't challenge the alliance's standing under the ESA except to the extent that it's not, their claims aren't redressable because by the time they filed the lawsuit, the record of... But now that we've, like, sort of fleshed this out as to the extent that they, and I've repeated it, articulated their there shouldn't have been a project because you broke the procedures. If that is an argument, do they have standing as to that argument? The government isn't challenging their standing to that argument here. With respect to the... I just want to briefly talk about the Loper-Bright Supreme Court decision and the Oxlade claims. So that the... Again, we don't think that this case requires any statutory interpretation except perhaps to the extent that the court finds that Oxlade doesn't prohibit or doesn't require maximizing one goal as you've stated, maximizing all goals. In other words, Oxlade doesn't prohibit any impacts to the environment. It doesn't require 100% safety. It doesn't require no impacts to the environment whatsoever. And really, it directs the agency to ensure that activities that it permits are carried out in a manner that provides for the 12 requirements. And so, you know, the Supreme Court has told us we have to say what words of a statute mean. So if we get into the list, there's a word safety. Yeah. Someone has to say what that is.  That's correct. Who says what that is? Well, Interior, in deciding whether to approve the permit or not, decides, and as it has decided here, that approving the permit, it is approving the permit in a way that ensures the activities will be carried out in a manner that provides for safety. And again, that's a factual and scientific determination that under Loeb or Bright is owed deference by this court. Because that's factual, but if it's interpreting the statute, ultimately, we do it, and if we decide those facts don't comply with the statute, then we would reverse, or if we agree they comply, then we affirm, as I asked in the previous case, correct? Well, I think the court would have to, I don't think the court decides, I think if the court were going to decide that the facts didn't, that the agency was arbitrary in determining that the project didn't provide for safety, it would have to look at the factual underpinnings of the agency's decision. But it's not a question of what is the legal interpretation of safety as a matter of law. And the agency doesn't disagree that it must provide for these things, that these requirements are mandatory. So there's really not a question. There's no disagreement that safety means not causing unnecessary harm or whatever definition And they haven't presented any arguments to that effect. What they've said is, my best understanding of their argument is that the agency can't allow for any impacts to fisheries. But that is not what the statute says. The plain language of the statute doesn't say that. It just says that the agency shall ensure that the activities are carried out in a manner that provides for safety, that provides for protection of the environment. So the bottom line is in this case we're not dealing with an agency interpretation of a statute.  You're addressing whether or not the agency was arbitrary and capricious in determining that the permit was consistent with the statute's  Okay. Well, thank you. Judge Montegallo, any further questions? No, thanks. Okay. Thank you very much. Thank you. Let's hear then from Mr. Steenland again. Welcome back. Please introduce yourself on the record. Peter Steenland, once more, may it please the court. Judge Helby, with regard to your two questions, first of all with regard to Loeb or Bright, you can take the eight briefs in these two cases, turn them inside out, upside down, shake them real hard. There's not a single citation to Chevron that'll fall out. That Supreme Court decision is entirely immaterial to any issue in this case. As the government said earlier, it's a different kind of deference having to do with APA deference and that's all it is. With regard to the court's earlier decision in the Nantucket residence case, there's, well, first of all, indicates that if our opponents had wanted to, they could have challenged the 2021 buyout because the Nantucket residence certainly did. But in a particular salience in that case is holding on page 27. It talks about the Stober study which had to do with ongoing noise. And the court rejected the allegation of concern because it wasn't presented to the agency. The agency never had an opportunity to address it. Judge Talwani had to, but the court said, we're not going to consider this. And throughout our brief and the government's brief, we make numerous references to several issues where our opponents simply have not challenged various matters. They haven't taken them head on. They wave their arms and holler a whole lot, but it doesn't really get them anywhere because they don't specifically join the issue. Let me talk about ESA very briefly and the concern about whether the agency was proceeding. You're right. This is a textbook case in administrative law. And there's lots of administrative law here because there are multiple agencies with multiple statutes and multiple decision processes. Our opponents say everything flows from NEPA and the rod. Wrong. The record of decision is a NEPA creation. It reflects the agency's satisfaction with the environmental analysis produced in the impact statement. And it gives the green light to the project. In this case, boom, issued the rod along with the memorandum and we went to the COP, the construction and operation plan. Why is that important? Because in the COP, BOEM said, you guys can't do anything that's going to impact protected species. They would still say the COP issued before the 2021 BIOP was finished, right? Absolutely. Wouldn't they still say you didn't have a valid BIOP, you can't be issuing these things? Well, let's look at that for a second because if someone had said, if NOAA had said, my heavens, we messed up. We made a misunderstanding about where the whales are or how many they are or something else like that. That might be a stronger argument. But why did they do a re-initiation? They did a re-initiation on a BIOP that said no likelihood of impact to the whale. That was the 2020 conclusion of the BIOP. And they said, well, we've got this new issue about how we're going to make Vineyard Wind address our previous ability to monitor fish. And that may have an impact. We don't want to leave that unstudied. So we'll address that. And in the meantime, there's yet one more study on whales that has come over the transom and we'll take a look at that too. And so you had a 2020 BIOP that said no likelihood of harm. And then when you got to the 2021 BIOP, it said the same thing because that issue was not really being addressed. They were supplementing, if you will, with new information, but they had to do that. So I see no harm there. And to say that you need to do a new EIS, no. No, you don't. Because under DIPA, the only reason you need to do a new EIS is for significant new information. That's what CEQ says. There's no significant new information here. It's just an update and a more modern assessment. So I just don't think they get any traction there. With regard to the alliance and our friend Captain Arapatch, he's not a plaintiff. He's not a party. He claims associational standing through LIQFA. And we've already discussed why and how that really doesn't work. LIQFA is a commercial entity. But you know, there's another point with regard to that. And this is in our Seafreeze brief, page 19, footnote 6. The last time LIQFA was in court, they were challenging a NIMS determination to create a marine sanctuary. And I don't know how you can square that action with this and say that Arapatch's interest, if legitimate, is germane to the purpose of the organization. I would conclude in this fashion. My friend Mr. Marzullo said this was a hurry-up process. Hardly. It began in 2012. And if you were to call in, if you were to somehow revive the congressional leaders who enacted NEPA, the OCSLA amendments, the Endangered Species Act, the Marine Mammal Protection Act, they would look at this and say, this is a job well done. We changed the project. We addressed the environmental concerns. We adopted a ton of mitigation measures that we imposed on the project. And not everybody's happy. It includes Vineyard Wind and it includes the association. But at the end of the day, it worked. And I think Judge Del Monte got it exactly right. And we would urge that her judgment be affirmed. Thank you. Thank you much, counsel. Let's hear two minutes of rebuttal. Mr. Marzullo. Please reintroduce yourself on the record to begin, sir. Yes. Roger Marzullo in rebuttal, Your Honor, appearing for the alliance. I really only have two points that have been raised, I think, with the arguments here. First is that, with all respect, the government has simply raised a straw person in respect to our interpretation of OXLA. We have never used the term maximize or 100%. Never made that argument. What we have said, and I will repeat it just once, is that the trial judge applied the balancing test. She called the requirements of OXLA. Okay, we can affirm another graph. Let's say that's wrong. Nevertheless, if I think that that provision requires the first paragraph, when you take insure and manner provide for and you put those together, and that that doesn't require maximum, let's just assume that, then what? Then what? The agency says we've done everything, we've made mitigation, we've taken all these steps, we've thought really hard about safety, we've come up with a product that we think is safe. Now what? The court explores that as set forth in the statute. What the court does not do is say, but we've got this very important project over here that we need to balance against those requirements. So we're going to dilute safety. We're going to dilute the health protection. Where's the evidence of that? That they said we've addressed safety, we actually don't think this is safe enough, but we're so concerned that wind happened, they were willing to look the other way towards safety. Where's that? That is the trial judge's standard, Your Honor. I'm referencing the standard that the trial judge applied. If she applied the wrong standard, then we can't say that she came to the right answer. Do you think there's record evidence that supports what you just described, which is that the agency looked the other way at safety because of a rush to get this project done? Is there evidence that you want to point me to of that? No, Your Honor. I'm not talking about what the agency did. I'm talking about reading the district court's opinion in which she rejected our position that these are requirements and instead said Massachusetts v. Andrus, you balance the project against the goals. We don't want to send this back for no purpose. So if the answer is that there is some play in the joints of what safety is, and the agency has gone through that process and determined this is safe as we see it, and you're not telling me that they ignored safety to do a rush to judgment to get the project going, then what are we sending it back to do? That issue was never briefed. It has not been examined. And I think that Seafreeze pointed out some instances in which the safety and certainly environmental protection have not been met. Your Honor, may I have just one moment? 30 seconds. 30 seconds. Let me ask this one thing. Do we have any further questions? No? Okay. So I'll just conclude now and finish. Thank you, Your Honor. Just to reference the discussion of the biological opinion, the trial judge held, and this is what Mr. Steenland is saying, that the operative biological opinion in this case was the 2021 biological opinion. And for those of us who did take administrative law in law school, we were taught that Kemp v. Pitts says the administrative record at the time of the decision is what governs, and that you can't take a document that is prepared months later and say, well, let's pretend that the Interior Department relied on that document. But you're ignoring that this is an ongoing process under the ESA. Reinitiation is part of the statutory scheme. Yes. So things are going to happen in the future. That's the whole point. Things will change regarding these species. And the statute is thinking, well, we have to account for that. Yes, and we account for that, Your Honor, with a supplement to the biological opinion. You don't say, as the May 7th letter from Bohm said, we need a new biological opinion. And then the trial court says this new biological opinion that came out five months later is the opinion by which you judge the validity of the administrative decision that was made five months ago. And would you agree that 2021 made no substantial difference from the 2020? It was still a no-jeopardy finding? Yes, it came to the same result, thank goodness. But that's not the before-you-leave statute that the endangered species is.  Thank you, Your Honor. Thank you, counsel. Counsel, just a quick question unrelated to the case. I assume your co-counsel is your daughter? No. No, because I see. I wish she were. No, I saw. Okay, but it's the same last name. Maybe it's on our end. In the brief, there's two people. Oh, that's not my daughter. That's my wife. Oh, your wife? She's my partner. Oh, okay, so I saw. She's not my wife either.  Okay, well, thank you. Safe travel back to Boston. Thank you. And except for counsel Steenland, who's crossing the bridge and going to lunch here. So thank you. Thank you, Your Honor. Thank you. Okay, let's call the next case.